UNITED STATES  DISTRICT COURT

Northern District of California

San Francisco Division

D. ANN CASTELLUCCI,                          No. C13-04450 LB

            Plaintiff,            **ORDER GRANTING PLAINTIFF'S**
                                                    **MOTION FOR SUMMARY**
    v.                                      **JUDGMENT, DENYING**
                                                    **DEFENDANT'S CROSS-MOTION**
                                                    **FOR SUMMARY JUDGMENT, AND**
CAROLYN W. COLVIN,                          **REMANDING FOR AN AWARD OF**
Acting Commissioner of Social Security,     **BENEFITS**

            Defendant.            **[Re: ECF No. 19]**
_____/

**INTRODUCTION**

    Plaintiff D. Ann Castellucci moves for summary judgment, seeking judicial review of a final

decision by Defendant Carolyn W. Colvin, the acting Commissioner of Social Security

Administration (the "Commissioner"), denying her Social Security Income ("SSI") disability

benefits for her claimed disability stemming from spinal stenosis, nerve damage, and degenerative

disc disease.  Pl.'s Mot., ECF No. 19 ("Motion");[1] Administrative Record ("AR") 164.  The

Administrative Law Judge ("ALJ") determined that Ms. Castellucci could not perform her past

relevant work but that she was capable of working as a telephone solicitor, a job that existed in

---

    [1] Citations generally are to the Electronic Case File ("ECF") with pin cites to the
electronically-generated page numbers at the top of the document.  Citations to the Administrative
Record refer to the agency-designated page numbers stamped at the bottom of the page.

UNITED STATES DISTRICT COURT
For the Northern District of California

significant numbers in the national economy.  AR 27.  Accordingly, the ALJ denied Ms. Castellucci's application for benefits.  *Id.*

Pursuant to Civil Local Rule 16-5, the matter is deemed submitted for decision without oral argument.  All parties have consented to the court's jurisdiction.  ECF Nos. 6, 12.  For the reasons stated below, the court **GRANTS** Ms. Castelluci's motion for summary judgment, **DENIES** the Commissioner's cross-motion for summary judgment, and **REMANDS** for an award of benefits.

## STATEMENT

## I.  PROCEDURAL HISTORY

Ms. Castelluci, now 60 years old, filed a Title II application for disability and disability insurance benefits on July 27, 2010.  AR 136.  The Commissioner denied her application both initially and upon reconsideration.  AR 67-71.  On April 26, 2011, Ms. Castellucci timely requested a de novo hearing before an ALJ.  AR 72-73.  The ALJ conducted a video hearing on March 6, 2012 in Oakland, California.  *See* Transcript, AR 37-57.  Ms. Castellucci appeared with her attorney, Mr. William Galvin, and testified at the hearing along with vocational expert David Dettmer (the "VE").  *See* AR 39.

On May 24, 2012, the ALJ issued a decision finding that Ms. Castellucci was not disabled because she had acquired work skills from past relevant work and was capable of working as a telephone solicitor, a job that existed in significant numbers in the national economy.  AR 26-27.

Ms. Castellucci timely requested that the Appeals Council review the ALJ's decision on June 6, 2012.  AR 14.  The Appeals Council denied the request for review on July 29, 2013, rendering the ALJ's decision as the final decision of the Commissioner.  AR 1-5.

On September 25, 2013, Ms. Castellucci filed a complaint for judicial review under 42 U.S.C. § 405(g).  Compl., ECF No. 1.  Ms. Castellucci and the Commissioner both have moved for summary judgment.  Motion, ECF No. 19; Comm'r's Opp'n and Cross-Mot., ECF No. 20 ("Opp'n").  Ms. Castelluci filed her reply to the Commissioner's Cross-Motion on May 19, 2014.  Reply, ECF No. 21.

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

## II. SUMMARY OF RECORD AND ADMINISTRATIVE FINDINGS

This section summarizes (A) the evidence in the administrative record, (B) the vocational expert's testimony, (C) Ms. Castellucci's testimony, and (D) the ALJ's findings.

### A. Medical Evidence

Ms. Castellucci was born on November 22, 1953. AR 140. Ms. Castelluci has a history of adrenal cancer and in about 2007, she had surgery on her right hand to correct trigger finger releases.[2] AR 23, 266. She alleged disability beginning March 11, 2010, due to nerve root damage, degenerative disc disease, limited range of motion as a result of spinal surgery, left radiculopathy, disc desiccation at L1-L4, osteoporosis of the spine, degenerative spondylolisthesis, spinal deterioration, nerve damage, and stenosis. AR 18, 164. In January 2010, Ms. Castellucci reported experiencing constant, debilitating pain in her low back, left buttock, hamstring, and calf region, possibly stemming from a lifting injury she suffered at work. AR 266. After complaining of worsening radicular and acute low back pain, Ms. Castelluci consulted with an orthopedist, Dr. Byers, who diagnosed her with spinal DDD (disc degenerative disease); spinal stenosis, with a facet joint cysts on her left L5-S1 vertebrae; and progressively worsening acute left-sided low back and sacaral pain, with left leg radiculitis. AR 262-64. To address these issues, Ms. Castellucci underwent two surgeries in March and September of 2010. AR 235. The surgeries did not relieve her symptoms.

#### 1. Kathy Chang, M.D.

On January 21, 2010, Ms. Castellucci went to Mt. Tam Orthopedics complaining of back pain. Attending physician Dr. Chang examined Ms. Castellucci. AR 266. Dr. Chang noted that Ms. Castellucci reported that her symptoms were "excruciating at present" and were "constant, worse with standing and walking." *Id.* She reported that Ms. Castellucci was unable to lift anything at all, stand at all, walk without assistance, or sit for more than half an hour. *Id.* Dr. Chang also noted that

---

[2] "Sudden arrest of the movement of extension (or, less frequently, of flexion) of one of the fingers until a special effort is made, when the movement is completed with a snap or jerk." Oxford English Dictionary, Third Edition, September 2004; online version July 2014 at http://www.oed.com/view/Entry/206003 (accessed July 28, 2014).

in the past, Ms. Castellucci received treatments, including heat, ultrasound, massage, traction, and an epidural injection. *Id.* Ms. Castellucci's lumbar x-rays revealed "disc spaces intact measuring 9 mm, 11 mm, and 10 mm." *Id.* Dr. Chang diagnosed Ms. Castellucci with "a left S1 radiculopathy indicative of an L5-S1 disc herniation with a prior history of a lifting injury diagnosed previously with a disc herniation, treated previously with epidural steroids, now with increasingly debilitating pain." *Id.* Dr. Chang also reported that she was unable to exclude the possibility that Ms. Castellucci's symptoms were "somehow connected with her underlying neoplastic condition." *Id.* Dr. Chang concluded that Ms. Castellucci would benefit from a lumbar corset, taking oral steroids, analgesic therapy, and antispasmodic therapy. AR 267. She also recommended that an MRI be taken of Ms. Castellucci's lumbar spine to determine whether she would benefit from epidural therapy, coblation therapy, and potentially an operative decompression. *Id.*

### 2. Ernest H. Sponzilli, M.D.

On February 1, 2010, at the recommendation of Dr. Chang, Ms. Castellucci underwent a lumbar MRI scan. AR 265. The MRI did not show any "pathologic processes," but revealed that Ms. Castellucci had spondylosis at her L3-4 vertebrae, facet effusions at her L4-5 vertebrae, and moderate central stenosis. *Id.* The MRI also revealed a small facet joint cyst on Ms. Castellucci's L5-S1, with marked compression of her left S1 nerve root. *Id.* Dr. Sponzilli reported that Ms. Castellucci was to have a hydraulic facet capsulotomy combined with a S1 epidural. *Id.*

On February 24, 2010, Dr. Sponzilli performed left S1 selective epidural/nerve root blocks and a left L5/S1 facet joint cyst aspiration/injection on Ms. Castellucci. AR 271. Ms. Castellucci reported experiencing a 25% reduction of her symptoms for less than one day as a result of these procedures. AR 271. A week later, on March 1, 2010, Dr. Sponzilli examined Ms. Castellucci again. AR 264. He reported that she "failed to improve with a facet capsulotomy and decompression," and was having debilitating radicular pain. AR 264. Dr. Sponzilli noted that Ms Castellucci would consult with Dr. Byers and Dr. Su regarding a facetectomy, and prescribed her with Dilaudid and Lyrica. *Id.*

### 3. Robert H. Byers, M.D. (March 2010-September 2010)

Dr. Byers, who is an orthopedic surgeon, has been Ms. Castellucci's treating physician since March 2010. AR 262. On March 5, 2010, at the request of Dr. Sponzilli, he evaluated Ms. Castellucci for the constant pain that she complained of in her lower back and left leg. AR 262. Dr. Byers noted that Ms. Castellucci reported experiencing such pain since December 2009. *Id*. Ms. Castellucci was "in obvious discomfort . . . and ambulate[d] with a limp on the left, but [was] able to heel and toe walk, bilaterally." *Id*. Upon examination of her thoracic/lumbosacral spine, Dr. Byers noted Ms. Castellucci had a limited range of motion of her back, "such that . . . she is unable to extend beyond neutral, and laterally bends 15 degrees, bilaterally, and left-sided low back pain is reproduced at the extremes of range of motion in all directions." *Id*. Physical tests on Ms. Castellucci's legs resulted in a positive sciatic stretch test, positive left bowstring test, and positive left straight leg raises. *Id*. X-rays of Ms. Castellucci's lumbosacral spine revealed "slight retrolisthesis at L1-2 and L2-3, as well as L4-5, and a slight disc space narrowing at L3-4 and L4-5." *Id*. Dr. Byers also reviewed Ms. Castellucci's February 1, 2010 lumbar MRI and noted that it revealed "diffuse DDD throughout the lumbosacral region" with a "developmentally small canal extending from L3 to S1, with mild to moderate central spinal stenosis at L3-4 and L4-5." AR 263. Dr. Byers reported that there was a "small left L5-S1 facet joint cyst with resultant compression of the left S1 nerve root and an annular fissure localized to the intraforaminal portion of the L5-S1 disc on the left, but no obvious disc herniation." *Id*. Dr. Byers concluded that Ms. Castellucci's clinical presentation was consistent with her lumbosacral spinal degenerative disc disease, and also revealed progressively worsening acute left low back/sacral pain and nerve root irritation. *Id*. He also concluded that an MRI scan confirmed the presence of a nerve root compression at her left S1 nerve root, which was caused by a facet joint cyst on Ms. Castellucci's left L5-S1 vertebrae. *Id*. Dr. Byers noted that this was consistent with Ms. Castellucci's distribution of symptoms. *Id*. Because Ms. Castellucci's symptoms continued to worsen despite her previous care under Dr. Sponzilli, Dr. Byers offered the option of microdecompression on her left L5-S1 vertebrae and surgically removing the facet joint cyst. *Id*. Dr. Byers reported that after a thorough discussion of the procedure and its related risks, Ms. Castellucci decided to proceed with the procedure. *Id*. In the

UNITED STATES DISTRICT COURT
For the Northern District of California

meantime, the doctor instructed Ms. Castellucci to continue taking her medications as prescribed.[3] *Id.*

On March 11, 2010, Dr. Byers performed decompression surgery on Ms. Castellucci's left L5-S1 vertebrae and also removed the facet joint cyst. AR 260, 318. On April 27, 2010, approximately six weeks after the surgery, Dr. Byers noted that Ms. Castellucci's left lower extremity symptoms had resolved, but that she continued to experience significant residual lower back pain. AR 260. He also reported that Ms. Castellucci was not taking any medication for her back pain. *Id.* Dr. Byers directed Ms. Castellucci to take ibuprofen and Dilaudid for pain control. AR 261.

Between April 27, 2010 and September 27, 2011, Dr. Byers evaluated Ms. Castellucci approximately every six weeks. AR 254-61, 370-73, 404-26. On June 15, 2010, Ms. Castellucci complained of recurring constant low back pain that radiated to her left buttock and thigh. AR 258. Dr. Byers noted that Ms. Castellucci reported less intense pain than before surgery, but that sitting continued to aggravate it. *Id.* Based on a physical examination, Dr. Byers noted that residual nerve root irritation persisted and was probably aggravated by Ms. Castellucci's increased level of activity. *Id.*

On August 11, 2010, an MRI of Ms. Castellucci's lumbar spine confirmed that an even bigger facet joint cyst had redeveloped on her left L5-S1 vertebrae, which compressed her left S1 nerve root. AR 254. Dr. Byers diagnosed Ms. Castellucci with "improved, but residual acute low back/sacral pain, with left lower extremity radiculitis, secondary to recurrence of left L5-S1 facet joint cyst, superimposed on lumbosacral spinal stenosis, status post decompression left L5-S1 with facet joint excision for lumbosacral spinal DDD." *Id.* Dr. Byers recommended that Ms. Castellucci undergo a second operation to alleviate her symptoms. AR 255.

On September 27, 2010, Dr. Byers performed another decompression surgery on Ms. Castellucci's left L4-5 and L5-S1 vertebrae, and placed bilateral screws at L5 and S1. AR 423. Dr.

---

[3] It is unclear from the record what medications Ms. Castellucci was prescribed as of March 5, 2010. A January 21, 2010 report indicated that Ms. Castellucci was taking medicines including Cozaar, Maxzide, Atenolol, Topamax, and Fluoxetine. AR 266. On March 1, 2010, she was also prescribed Dilaudid and Lyrica. AR 264.

1  Byers noted that Ms. Castellucci participated in acute rehabilitation at St. Francis Hospital after

2  surgery.  *Id.*

3  On November 10, 2010, six weeks post surgery, Dr. Byers reported that Ms. Castellucci

4  complained of low back pain and indicated that she noted "recurrence of left lower extremity

5  symptoms approximately one week ago."  *Id.*  Dr. Byers also noted that Ms. Castellucci recalled

6  having night sweats during rehabilitation, which continued to persist.  *Id.*  Dr. Byers recommended

7  that Ms. Castellucci undergo laboratory studies, and a CT scan of her lumbar spine.  AR 424.

8  Accordingly, on November 15, 2010, Ms. Castellucci underwent a CT scan of her lumber spine.  AR

9  421.

10  On November 18, 2010, Dr. Byers reviewed Ms. Castellucci's CT scan, which revealed evidence

11  of decompression and excision of her facet joint cyst.  *Id.*  Dr. Byers reported that although her left

12  S1 screw appeared to be adjacent to her left S1 nerve root, it was not causing compression.  *Id.*  He

13  concluded that Ms. Castellucci's increased left leg pain likely was related to her increased level of

14  activity and postoperative root irritation, and not due to screw placements or compression.  *Id.*

15  ### 4. P. Davis, Psy.D.

16  On November 18, 2010, Ms. Castellucci underwent a psychiatric review by Dr. P. Davis, a State

17  agency psychological consultant.  AR 336.  Dr. Davis opined that Ms. Castellucci had (a) no

18  restrictions of daily living activities, (b) no difficulties in maintaining social functioning,

19  concentration, persistence, or pace, and (c) no continuous episodes of decompensation.  AR 346.

20  Dr. Davis noted possible dysthymia but categorized it as "not severe."  AR 336, 339.

21  ### 5. Dale Van Kirk, M.D.

22  On December 21, 2010, approximately three months after Ms. Castellucci's second back

23  surgery, Ms. Castellucci saw Dr. Dale Van Kirk, who performed a consultative orthopedic

24  evaluation.  AR 350-54.  Dr. Van Kirk noted that Ms. Castellucci sat in moderate pain in the

25  examination chair, got up and out of the chair "slowly but surely," walked around the room, and got

26

27

28

on and off the exam table with some discomfort.  AR 351.  A Romberg test[4] proved to be abnormal and Ms. Castellucci wavered and almost fell after 2 seconds.  AR 352.  The doctor also observed reduced range of motion in Ms. Castellucci's lumbar region, but full range of motion in her cervical regions and in all joints.  AR 352-53.  Regarding functional capacity, Dr. Van Kirk opined that Ms. Castellucci should be able to stand and/or walk cumulatively for 4 hours out of an 8-hour day with periodic rest sitting down; should be able to sit cumulatively for 4 hours out of an 8-hour day but would need to get up and move around periodically to stretch and reposition herself; and should be able to lift and carry 10 pounds frequently[5] and 20 pounds occasionally.[6]  AR 353-54.  He also noted that Ms. Castellucci is limited to only occasional postural activities (including bending, stooping, crouching, climbing, kneeling, balancing, crawling, pushing, or pulling) due to significant residual pain in the lower back.  AR 354.  Dr. Van Kirk diagnosed Ms. Castellucci with "status-post two lumbar surgeries" with residual pain and recommended that she use her lumbar corset when she is out and about for even and uneven terrain.  AR 353.

### 6. Dr. Byers (December 2010)

On December 28, 2010, Dr. Byers noted that Ms. Castellucci reported "constant mild low back pain with radiation to the left buttock region" extending to her thigh.  AR 419.  Dr. Byers also noted that Ms. Castellucci stated that her symptoms were more severe when sitting, a little less when walking or standing, and diminished when lying down.  *Id.*  Dr. Byers recommended that Ms. Castellucci participate in physical therapy and continue taking her medication.  AR 420.

---

[4] "A test used in physical diagnosis in which a patient is asked to stand with the feet together, and then to close the eyes."  Oxford English Dictionary, Third Edition, September 2004; online version July 2014 at http://www.oed.com/view/Entry/167150 (accessed July 28, 2014).

[5] "'Frequently' means occurring one-third to two-thirds of an 8-hour workday (cumulative not continuous)."  AR 355.

[6] "'Occasionally' means occurring from very little up to one-third of an 8-hour work day (cumulative, not continuous)."  *Id.*

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

### 7. S. Amon, M.D.

On January 7, 2011, State agency medical consultant Dr. S. Amon reviewed Ms. Castellucci's medical records and assessed her functional capacity. AR 355-61. In his assessment, Dr. Amon opined that (a) Ms. Castellucci is able to lift and/or carry 20 pounds occasionally and 10 pounds frequently, (b) stand and/or walk for at least 2 hours in an 8-hour workday, and (c) sit for about 6 hours in an 8-hour workday. AR 356. Additionally, Dr. Amon opined that Ms. Castellucci could occasionally climb, stoop, kneel, crouch, and crawl. AR 357.

### 8. Dr. Byers  (February 3, 2011)

On February 3, 2011, Dr. Byers recommended that Ms. Castellucci undergo another MRI scan of her lumbar spine and pelvis, and it was conducted on February 11, 2011. AR 413, 418. The MRI scans revealed increased subarticular stenosis on her left L3-4 vertebrae with potential compression of her left L4 nerve root and her exiting L3 nerve root. *Id.* The MRI scan of her pelvis also revealed mild degenerative changes in her left hip, which Dr. Byers opined could be contributing to her symptoms. AR 414.

### 9. Lisa M. Elvin, N.P.

On February 25, 2011, Ms. Castellucci saw Nurse Elvin, who worked with Dr. Byers at Mt. Tam Orthopedic Spine Center. AR 415. Upon physical examination, Nurse Elvin noted that Ms. Castellucci "is significantly disabled in her ability to sit, stand and walk for less than 15 minutes in virtually all planes." AR 416. She also reported that Ms. Castellucci "spends 40% of her time lying down to unload her back" and could foresee that Ms. Castellucci "would have absolutely no ability to compete in the open job market because no employer would be able to tolerate her need to miss work on a fairly routine basis" due to the unpredictable nature of her pain. *Id.* Nurse Elvin also reported providing Ms. Castellucci with a Lidoderm patch for pain control. *Id.*

### 10. Dr. Byers (February 25, 2011-April 2011)

On the same day, approximately five months after Ms. Castellucci's second operation, Dr. Byers completed a lumbar spine residual functional capacity questionnaire. AR 375-78. He noted that Ms. Castellucci had reduced range of motion, sensory loss, tenderness, and muscle spasms, as well as a positive straight leg raise. AR 376. He reported that Ms. Castellucci constantly experienced pain

that was severe enough to interfere with attention and concentration needed to perform even simple task work. *Id.*

He opined that Ms. Castellucci needed to change positions frequently during the work day. *See* AR 376-77. Specifically, he indicated that Ms. Castellucci could only walk 1/4 block without rest or severe pain. AR 376. She could only sit for 15 minutes at a time before needing to get up and could only stand for 10 minutes at a time before needing to sit down or walk around. *Id.* 377. She could sit or "stand/walk" for less than 2 hours in an 8-hour work day. *Id.* At the same time, however, she needed to take a 5 minute walk every 15 minutes. *Id.*

With regard to conditions of employment, Ms. Castellucci needed a job that would permit her to shift positions at will and would allow her to take unscheduled breaks for about 15 minutes at least every 30 minutes. *Id.* She also would be absent from work on average more than four days per month (the most frequent option on the form). AR 378.

Dr. Byers also opined on Ms. Castellucci's physical abilities. *See* AR 377-78. He stated that in a competitive work situation, Ms. Castellucci could rarely lift less than 10 pounds and never lift 20 or 50 pounds. AR 377. She could rarely climb stairs and never twist, stoop, crouch, squat, or climb ladders. AR 378. She had significant limitations with reaching, handling, or fingering because she could not "raise above shoulders." *Id.* She could use her hands and fingers to grasp, turn, twist objects, and perform fine manipulations up to 30% of an 8-hour workday. *Id.*

Finally, Dr. Byers noted that the symptoms and limitations in the questionnaire first applied from between December 2009 and January 2010.

Ms. Castellucci saw Dr. Byers again on March 1, 2011. AR 413. Dr. Byers noted that Ms. Castellucci "continues to describe low back pain during the day, but sharp low back pain at night." *Id.* After a lengthy discussion, Dr. Byers recommended that Ms. Castellucci undergo left L3 and L4 nerve root blocks to relieve her symptoms. AR 414. Accordingly, she underwent nerve root blocks on March 25, 2011. *See* AR 412, 433. On April 5, 2011, Dr. Byers noted that Ms. Castellucci reported experiencing a 25% reduction of her low back symptoms approximately one week after the injections, but reported that "positive findings are slightly less so on physical examination today." AR 412.

### 11.  Ms. Castellucci's Mother's Third Party Function Report

The Administrative Record also contains a Third Party Function Report dated March 21, 2011,[7] filled out by Isabelle Trevethan, Ms. Castellucci's mother.  *See* AR 212-19.  Ms. Trevethan identified herself as Ms. Castellucci's mother and indicated they lived together.  *See* AR 212. According to Ms. Trevethan, Ms. Castellucci was able to help with chores, including, dusting, and cooking but could not garden, take baths, bend to pick things up from the floor, care for her feet, or pull anything over 6-7 pounds, and she needed some help dressing.  AR 212-15.  Ms. Castellucci went shopping two or three times a week but not for longer than an hour.  AR 215.  Ms. Castellucci could drive but could not look to her right or left, so Ms. Trevethan had to check for traffic for her. AR 212.  Ms. Trevethan noted that Ms. Castellucci's disability affected her ability to lift, squat, bend, reach, walk, kneel, climb stairs, and complete tasks.  AR 217.  It did not affect her ability to stand, sit, talk, hear, see, remember things, concentrate, understand, follow instructions, use her hands, or get along with others.  *Id.*  She could walk for 30 minutes before needing a 10 minute rest. *Id.*  Finally, Ms. Castellucci required the use of a cane and a brace when she left home, and she also used a "picker" (a device used to pick things up from the floor).  AR 212, 218.

### 12.  N.J. Rubaum, M.D.

On April 13, 2011, Dr. N.J. Rubaum, another State agency medical consultant, reviewed Ms. Castellucci's medical records and assessed her functional capacity.  AR 383-90.  Dr. Rubaum noted Dr. Byers's opinions in the February 25, 2011 RFC questionnaire.  *See* AR 390.  He then wrote the following:  "Inconsistencies within/between reports and allegations: Credibility."  *Id.*  The report does not identify the alleged inconsistencies.  Ultimately, Dr. Rubaum agreed with Dr. Amon's RFC assessment.  *Compare* AR 383-90 (Dr. Rubaum's assessment), *with* AR 355-61 (Dr. Amon's assessment); *see* AR 390 ("The prior assessment re. physical impairments is affirmed.").

---

[7] The last page of Ms. Trevethan's report is dated March 11, 2011.  *See* AR 219.  The precise date is not relevant for this analysis.

1

### 13. Dr. Byers (May 2011-January 2012)

2    Dr. Byers treated Ms. Castellucci five times between May 2011 and January 2012.  Ms.

3  Castellucci saw Dr. Byers on May 17, 2011, June 28, 2011, August 16, 2011, September 27, 2011,

4  and January 4, 2012.  *See* AR 403-11.

5    On May 17, 2011, Dr. Byers reported that Ms. Castellucci began noticing "some recurrence of

6  constant left buttock pain radiating" to the left thigh about three weeks after the March 25, 2011

7  injections.  AR 410.  On May 17, 2011 and again on June 28, 2011, Dr. Byers reported offering Ms.

8  Castellucci the option of undergoing another left L3 and L4 nerve root blocks in an effort to further

9  diminish her symptoms.  AR 411.  In September 2011, Ms. Castellucci underwent another left L3

10  and L4 nerve root blocks in September 2011.  AR 404.  However, he noted that Ms. Castellucci

11  "denies having experienced any symptomatic benefits" from the second nerve root blocks.  *Id.*  On

12  September 27, 2011, about one year after Ms. Castellucci's second operation, Dr. Byers noted

13  improved, but residual chronic low back/sacral pain, with recurrent lower extremity radiculitis and

14  improved acute proximal left anterior thigh pain.  *Id.*

15    On January 4, 2012, Dr. Byers noted that Ms. Castellucci expressed concern regarding the

16  depression she had developed and her inability to sleep at night.  AR 403.  Dr. Byers recommended

17  that Ms Castellucci meet with Nurse Elvin to discuss her depression and inability to sleep.  *Id.*

18

### 14. Nurse Elvin (January 2012)

19    On January 18, 2012, Nurse Elvin noted that Ms. Castellucci was somewhat depressed and

20  tearful (though she denied feeling suicidal) and she was "incredibly sleep deprived."  AR 401.

21  Nurse Elvin prescribed Ms. Castellucci with Cymbalta to help her sleep.  *Id.*

22

### 15. Dr. Byers (February 2012)

23    On February 3, 2012, Ms. Castellucci saw Dr. Byers for another left lumbar L3 and L4 nerve

24  root block procedure.  AR 399, 427.  Approximately two weeks later, on February 15, 2012, Dr.

25  Byers reported that Ms. Castellucci's symptoms had worsened, and diagnosed her with persistent

26  residual chronic low back/sacral pain, with recurrent left lower extremity radiculitis, which appeared

27  to be further aggravated by the nerve root blocks performed on February 3, 2012.  AR 399.  The

28

UNITED STATES DISTRICT COURT
For the Northern District of California

doctor opined that Ms. Castellucci might benefit from additional diagnostic studies.  AR 400.  Dr. Byers also requested additional MRI and CT scans of Ms. Castellucci's lumbar spine.  *Id.*

### 16.  Jay Kaiser, M.D. (February 27, 2012)

On February 27, 2012, Ms. Castellucci underwent another MRI scan.  AR 447.  Dr. Jay Kaiser of Mt. Tam Orthopedics interpreted the results.  *See* AR 447-48.  He noted an "interbody fusion with pedicle screws at L5-S1.  There has been a left laminectomy and partial facetectomy.  There is decrease in the type 1 endplate degenerative change since the prior study but type 1 endplate change remains and the possibility of continued motion cannot be excluded."  AR 448.  Ms. Castellucci's L4-L5 vertebrae showed  "mild annular bulging facet anthropathy with mild central canal stenosis unchanged," and "mild bilateral foraminal stenosis unchanged."  *Id.*  Her L2-L3 vertebrae had "mild disk desiccation and [a] small Schmorl's node formation unchanged."  *Id.*

### 17.  CT Scan Results (April 5, 2012)

Dr. Byers referred Ms. Castellucci to California Care Imaging Center for another CT scan, which was conducted on April 5, 2012.  *See* AR 460.  The results were signed by Barry Engelstad, whose qualifications are not apparent from the record.  *See* AR 461.  Mr. Engelstad noted that the CT scan showed the following: (1) "[p]revious L5-S1 discectomy and left laminectomy with posterior arthrodesis and interbody spacer.  Reactive sclerosis to the space eccentric left;" (2) "[c]entral stenosis at the L3-4 and L4-5 levels, mild-moderate;" (3) "[l]evoscoliosis;" (4) "[o]steopenia;" and (5) "[p]revious left adrenalectomy."  AR 461 (the final page of the report is not included in the Administrative Record).

### B.  The Administrative Hearing

On March 6, 2012, the ALJ held an administrative hearing on Ms. Castellucci's applications.  *See* AR 18-28.  The vocational expert and Ms. Castellucci gave live testimony.  *See* AR 18.  The hearing was held in Oakland, California, though the ALJ was in Phoenix, Arizona, and presided over video.  *Id.*

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

### 1. Ms. Castellucci's Testimony

Ms. Castellucci was the first witness to testify.  *See* AR 43.  In response to the ALJ's questions, Ms. Castellucci described her daily activities, medical conditions, past work experience, and current medications, as summarized below.  AR 43-49.

First, the ALJ asked a series of questions about Ms. Castellucci's daily activities.  AR 43.  Ms. Castellucci testified that could drive, but she only drove "about a block or two" and had to have somebody with her.  *Id.*  She stated that she drove to the post office to get her mail, and once or twice a week to the grocery store.  *Id.*  Ms. Castellucci testified that because of the hard surface floors in the grocery store, she could not stand for more than five or ten minutes, and she had someone unload her cart onto the conveyor belt for her.  *Id.*  The ALJ then asked Ms. Castellucci whether she took public transportation, to which she answered, "No . . . my balance is not good and I have a problem with – I drag one of my legs."  *Id.*

Next, the ALJ asked Ms. Castellucci about her education level and past work.  *Id.*  Ms. Castellucci testified that she completed college and had a business degree.  *Id.*  Her most recent job was working for an accounting firm in marketing.  AR 44.  This entailed managing the company's database, conducting research, holding seminars, advertising, meeting with clients, and designing proposals and written materials.  AR 44-45.  She would have to lift and carry 30-40 pounds worth of marketing materials.  AR 45.  Ultimately, she had to leave the job because of her back surgery.  *Id.*

Ms. Castellucci also described other jobs she had held in the past.  She had worked in a contract job in benefits administration, where she set up seminars to describe Medicare benefits to eligible participants.  *Id.*  She had worked for a residential capital mortgage company doing marketing and developing new clients.  AR 46.  She had owned a company called International Architects on Tour.  *Id.*  In that role, Ms. Castellucci designed continuing educational programs for architects.  *Id.*  She was also a Director of Marketing at a company called Club Corporation of America, which involved marketing and attending social and promotional functions.  AR 47.

The ALJ then inquired about Ms. Castellucci's symptoms and why she was not able to work anymore.  *Id.*  Ms. Castellucci responded:

I can't walk very far. I can't sit for more than a couple minutes. I'm in constant pain. I've had three surgeries in the last 19 months. I've had four unsuccessful nerve root blocks, and I'm looking at potentially more spinal fusion surgeries. I'm not getting better. I'm in constant pain. I don't sleep at night. There is not too much I can do.

*Id.* The ALJ also asked about Ms. Castellucci's difficulty in using her right hand. *Id.* Ms. Castellucci testified that five years previously, she had surgery on her hand and three fingers because her fingers would lock. *Id.* As a result, she lost the grip and strength in her right hand and had to perform most of her chores using her left hand though she was right-handed. AR 48-49.

Ms. Castellucci's attorney then asked her a series of questions about her use of pain medications. AR 49. Ms. Castellucci testified that she used pain medication but she did not take her pain medication or her "nerve medication" the night before the hearing because it made her "groggy." *Id.* Finally, the ALJ asked what Ms. Castellucci's current pain level was from a scale of 0-10, 0 being no pain and 10 being "like the worst pain imaginable." *Id.* Ms. Castellucci answered, "8." *Id.*

### 2. Vocational Expert

David Dettmer, the VE, testified immediately after Ms. Castellucci. *See* AR 49. The ALJ asked the VE to identify Ms. Castellucci's vocational history over the previous 15 years. AR 50. The VE commented that Ms. Castellucci had held unusual jobs that were not usually encountered in hearings and that were not easy to exactly identify, but said he would "do [his] best" in categorizing them. *Id.* The VE identified Ms. Castellucci's past relevant work as falling into the following categories: (1) sales agent/business service (DOT #251.357-010) with light exertion[8] and an SVP of 5,[9] and (2) insurance sales agent (DOT #250.257-010) with light exertion and an SVP of 6. AR 50-51. The

---

[8] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . [A] job is in this category . . . requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. § 404.1567 (2012).

[9] "The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 C.F.R. §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled worked corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT." Social Security Ruling 00-4p (SSR 00-4p).

ALJ asked Mr. Dettmer if Ms. Castellucci had gained any transferable skills through her training or education.  AR 51.  Mr. Dettmer responded, "Well, there would be computer skills.  There would be sales skills.  General knowledge of insurance programs, accounting procedures, et cetera, but not detailed knowledge.  So I'd say mostly computer and sales skills, judge."  AR 51.

The ALJ then posed a hypothetical with the following limitations:

> All right.  So let's assume we have an individual who is of the Claimant's age and she was 56 of advanced age at her onset date, education and work history.  This individual can perform sedentary work.  She's able to lift and carry 10 pounds occasionally and less than 10 pounds frequently.  This individual can sit for six hours and can stand and/or walk for four hours.  And this individual would need a sit/stand option of 30 minutes sitting and 30 minutes either standing or walking.  Would the Claimant be able to do any – would this person be able to do any of the Claimant's past work?

AR 51-52.  The VE responded that none of the Ms. Castellucci's previous jobs "were really sedentary,"[10] so he would say "no."  *See* AR 52.

Next, the ALJ asked whether such an individual could perform other jobs.  *Id.*  The VE testified that he "cannot eliminate something like telephone sales," and specified "telephone solicitor 299.357-014 a sedentary, SVP: 3," semi-skilled position that requires "a lot of data entry, mostly calling, having a headset."  *Id.*  When the ALJ asked the VE if he could identify other positions that such an individual under the hypothetical could perform, the VE stated that he was "just not going to find a significant number of sit/stand sedentary jobs" and that this was essentially an exhaustive list.  AR 53.

The VE testified that there were about 26,000 positions in California and 220[,000] positions nationwide for telephone solicitors, but the sit/stand requirement would probably reduce the available jobs by three quarters, which would convert to roughly 6,000 positions in California and 55,000 nationwide.  *Id.*  When the ALJ asked the VE to consider the same hypothetical individual

---

[10]  "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567 (2012).

1   who also "has a limitation of occasional fingering with her dominant hand." AR 53.  The VE

2   indicated that would reduce the available jobs by another 50 percent.  *Id.*

3       Mr. Galvin then cross-examined the VE and asked:

4       [I]f this person that we've come up with on the telemarketing soliciting job had to take
        breaks at unscheduled times [f]or as long as 15 minutes outside of the normal breaks allotted

5       for that type of job due to pain considerations, would that erode that job even further?

6   *Id.*  The VE responded  "that would not be tolerated in a phone bank situation" but that "some

7   telephone solicitors work from home and make calls but those are very much the minority and there

8   would not be a significant number of jobs" after reducing the available jobs to account for the

9   limitations that were previously discussed.  AR 53-54.  Mr. Galvin then asked whether in a "normal

10  job situation where you're not working from home, can you do this job laying down?" AR 54.  The

11  VE answered, "no" and agreed that this would eliminate that job.  AR 54.

12      At the end of the hearing, the ALJ said that she would send Ms. Castellucci to an orthopedic

13  consultative exam before making her decision.  *See* AR 55.  Ms. Castellucci asked whether she

14  would be referred to "the person that you sent me to before." *Id.*  She said that person "took my

15  blood pressure in a storeroom.  He asked my name, checked my reflexes, looked at the scar on my

16  back and that was it, and then wrote a report saying that I was capable of lifting 40 pounds and all

17  this without having any substantial background or data to . . . substantiate that." *Id.*  The ALJ

18  reassured Ms. Castellucci that she would "send the records that I have that relate to the impairment

19  that I'm most interested in."  AR 55.

20  **C. Post-Hearing Medical Evidence & Criticism**

21      On April 11, 2012, Dr. David Franklin Osborne performed an orthopaedic consultative

22  evaluation on on Ms. Castellucci at the Concord, California office of MSLA, A Medical

23  Corporation.  *See* AR 462.  Ms. Castellucci was accompanied by her mother.  *See* 465.  Dr.

24  Osborne's report states that "information was obtained through historical interview with the

25  claimant" and "[m]edical records were reviewed."  AR 462-63.  In addition, Dr. Osborne physically

26  examined Ms. Castellucci.  *See* AR 465.

27      Several of Dr. Osborne's observations related to his impressions of Ms. Castellucci's credibility.

28  Dr. Osborne reported that he "considered [Ms. Castellucci's] reliability to be poor because of

UNITED STATES DISTRICT COURT
For the Northern District of California

exaggeration of symptoms on history and physical exam." AR 462. Under "Informal Observations," he wrote, "Credibility: There was exaggeration noted by this examiner." *Id.* During the physical examination, he noted that Ms. Castellucci had "poor effort" with regard to the range of motion tests on her thoracolumbar spine and right hand and the grip strength test. *See* AR 466-67.

With regard to the medical records, Dr. Osborne reviewed radiological reports of MRIs and CT scans dated 11/15/2010, 2/2/11, 2/11/2011, 5/16/11, and 2/27/2012. AR 463. He also reviewed "two procedural notes concerning a left lumbar L3 and L4 nerve root block" that were dated 3/25/2011 and 9/9/2011. *Id.* Finally, Dr. Osborne reviewed the clinic notes from Mt. Tam Orthopedic Group and Dr. Byers. *Id.* He noted that Dr. Byers's January 4, 2012 clinic note "is a good summation of [Ms. Castellucci's] history and physical exam as well as present course of action." *Id.*

Dr. Osborne also examined Ms. Castellucci. Under "General Appearance," he noted the following:

> The claimant appears to be a well-developed and well-nourished white female. She a[ppe]ars uncomfortable. She was sitting on the exam table when I entered the room. Her mother accompanied her to the examination. She is slow to get on and off of the exam table but can without assistance. She walks around the exam room with a cane in her right hand and her left hand supporting her lower back.

AR 465. Dr. Osborne examined the range of motion in Ms. Castellucci upper extremities, shoulders, lower extremities, cervical spine, thoracolumbar spine, hands, and feet. *See* AR 466-67. He noted that Ms. Castellucci's range of motions was moderately limited in her shoulders[11] and cervical spine.[12] AR 466. She had severe range of motion limitation in her thoracolumbar spine.[13] AR 466-67. She had a moderate limitation of motion of all fingers on her right hand and visible incisions

---

[11] On tests where a normal range of motion is from 0 to 180 and 0 to 90 degrees, Ms. Castellucci's range of motion was from 0 to 140 and 0 to 60 degrees, respectively. AR 466.

[12] On 6 tests where a normal range of motion is from 0 to 45 degrees, Ms. Castellucci's range of motion was from between 0 to 20 degrees and 0 to 25 degrees. AR 466.

[13] On a test where a normal range of motion is from 0 to 90 degrees, Ms. Castellucci's range of motion was from 0 to 20 degrees. AR 467. On five other tests where a normal range of motion is from 0 to 30 degrees, Ms. Castellucci's range of motion was 0 to 5 or 0 to 10 degrees. *Id.*

that were consistent with trigger finger release.  AR 467.  Dr. Osborne also noted, however, that Ms. Castellucci had a full passive range of motion, and there was no evidence of any right hand atrophy. *Id.*  Furthermore, he reported that Ms. Castellucci's effort was poor in demonstrating active range of motion of her right hand, and her grip strength was inconsistent with her motor strength.  *Id.*

Dr. Osborne diagnosed Ms. Castellucci with spine pain and left leg radiculopathic symptoms without objective findings.  AR 468.  He opined that the spine pain would limit Ms. Castellucci's activities but the radiculopathic symptoms would not.  *Id.*  Specifically, Dr. Osbone opined that Ms. Castellucci had the following exertional limitations:  Ms. Castelluci could lift and/or carry 10 pounds occasionally and frequently, could stand and/or walk with normal breaks for up to 2 hours in an 8-hour workday, and sit with normal breaks for six hours in a normal work day (though outside of normal break periods, she would have to alternate sitting and standing to relieve pain and discomfort).  *Id.*  Ms. Castellucci required a cane "for balance and support" all day and on all terrain. AR 469.

Just after noting Ms. Castellucci's constant need of a cane "for balance and support," Dr. Osborne opined that "[c]limbing ramps, stairs, ladders, ropes and scaffolds can be done frequently" and "[b]alancing can be done frequently."  AR 468-69.  Ms. Castellucci could never stoop, kneel, crouch, or crawl, but the report fails to explain why that is so.  *See* AR 469 (sentence fragment ending with "can never be done due to").  Dr. Osborne also opined that Ms. Castellucci could reach without limitations in all directions, including overhead, and could perform gross and fine manipulations (handling and fingering) without limitation.  *Id.*

Dr. Osborne attached a partially completed Medical Source Statement to his report.  *See* AR 470-75.  The MSS asked Dr. Osborne to tie the limitations identified to medical or clinical findings and identify "why the findings support the assessment."  *See* AR 470-475.  In response, the MSS states "[s]ee report."  *See* AR 470-73.  Dr. Osborne's report does not indicate how his medical records and clinical findings support his opinions about Ms. Castellucci's limitations.  *See* AR 468-69.  Dr. Osborne signed his report and MSS and both are dated April 11, 2012.  *See* AR 462-75.

In a fax dated the same day as Dr. Osborne's examination, Ms. Castellucci wrote to her attorney, William Galvin, about the exam.  *See* AR 239.  She said that she was initially seen by an assistant,

who administered an eye exam, took her vitals, measured the length and diameter of her arms and legs, and had her grasp a device that measured grip strength. *Id.* She gave the following account of Dr. Osborne's exam:

> The doctor did not see me until 10:45 and the exam lasted 10 minutes. He asked if I had any surgeries. I had given him the latest MRI and the report from the Laser Spine Institute with their recommendations. He did not read them. He had the medical reports sent to him by Social Security in front of him. When I told him the spinal surgeries I had, I told him they we[re] listed in the material I had given him and the medical reports he had. He said he had not read them!! He had me walk a few steps with my cane, checked my reflexes, strength in my limbs and hands, flexibility in my legs and neck. He did not ask about my pain level, if I could lift, bend, stoop or carry, if I had trouble sleeping. He asked about all my other surgeries and checked the scars and my hand and right shoulder but neglect the scars from my operation to remove the tumor and my adrenal gland 5 months ago.
>
> That was the extent of my exam.

AR 239.

In a letter to Mr. Galvin dated May 7, 2012, Ms. Castellucci reiterated her complaints about Dr. Osborne's examination and addressed the contents of his report. *See* AR 243-44. Specifically, Ms. Castellucci states that "Dr. Osborne listed tests he did not perform . . . and chose to disregard relevant medical reports and details which would negate his work of fiction." AR 243. In addition to the details in her April 11 fax, Ms. Castellucci stated:

> He did not perform the following tests that he included on his reports.
> Thoracolumbar Spine Examination
> Hands/Feet
> Neurologic Exam/Motor
> Sensation

AR 244. She also argued that he "chose to ignore the MRI findings, the reports, diagnosis and surgical plans from the Laser Spine Institute as well as Dr. Byers. All these not that there are several problem areas with my spine. This MRI also notes that the spinal fusion does not appear stable."

On May 9, 2012, Ms. Castellucci's mother, Ms. Trevethan, sent a letter to Mr. Galvin that corroborated Ms. Castellucci's contentions that Dr. Osborne's report was inaccurate and misleading and that Dr. Osborne did not perform the tests mentioned above. *See* AR 480. She signed the letter "Isabella M. Tevethan, R.N. BscN," *Id.*

UNITED STATES DISTRICT COURT
For the Northern District of California

**D.  The ALJ's Findings**

On May 24, 2012, the ALJ issued her decision, finding that Ms. Castellucci was not disabled and not entitled to disability insurance benefits.  AR 28.

### 1.  Step One

At step one of the sequential evaluative process, the ALJ found that Ms. Castellucci had not engaged in substantial gainful activity since the alleged onset date of March 11, 2010, and that she met the insured status requirements of the Social Security Act through September 30, 2015.  AR 20.

### 2.  Step Two

At step two, the ALJ came to different conclusions regarding Ms. Castellucci's physical and mental impairments.  AR 20-21.

#### a.  ALJ's Findings on Ms. Castellucci's Physical Impairments

The ALJ determined that Ms. Castellucci suffered from "the following severe [physical] impairments: status post L5-S1 discectomy and left laminectomy; central stenosis at L3-L4 and L4-L5, mild-moderate; levoscoliosis; status post adrenal mass surgery; status post surgery on her right hand."  AR 20.

#### b.  ALJ's Findings on Ms. Castellucci's Mental Impairments

The ALJ found that Ms. Castellucci's depression was not severe because it did not cause more than a minimal limitation to her ability to perform basic mental work activities.  AR 21.  In making this finding, the ALJ explained that she considered the four functional areas referred to as the "paragraph B criteria:"  (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation.[14]  *Id.*  The relevant evidence was Ms. Castellucci's Function Report and Dr. Davis's November 18, 2010 psychiatric assessment.  *Id.*  With regard to the first functional area, the ALJ reported no limitations in daily activities due to her depression.  *Id.*  With regard to the second functional area, the ALJ found that Ms. Castellucci's depression did not limit her social functioning and noted that Ms. Castellucci reported talking to

---

[14]  Referring to the disability regulations for evaluating mental disorders and § 12.00C of the Listing of Impairments under 20 C.F.R. § 404, Subpart P, Appendix 1

1    friends and family on the telephone and that she had no problems getting along with them,

2    neighbors, or authority figures.  *Id.*  The ALJ also found that Ms. Castellucci's depression did not

3    limit her concentration, persistence, or pace, that she reported reading listening to music, and

4    watching the news on television," and that she "is able to follow written and spoken instructions and

5    handle stress and changes in routine excellently."  *Id.*  Finally, the ALJ found that Ms. Castellucci

6    had not experienced any "episodes of decompensation that have been of extended duration" and

7    observed that these findings were consistent with Dr. Davis's assessment.  *Id.*  Ultimately, the ALJ

8    opined that "[b]ecause Ms. Castellucci's medically determinable mental impairment causes no more

9    than 'mild' limitation in any of the first three functional areas and 'no' episodes of decompensation

10   for an extended duration, it is nonsevere."  *Id.*

11       ### 3.  *Step Three*

12       At step three, the ALJ found that Ms. Castellucci did not suffer from an impairment or

13   combination of impairments that either was listed in the regulations or medically equivalent to one

14   of the listed impairments.  AR 22.

15       ### 4.  *Residual Functional Capacity*

16       The ALJ then determined Ms. Castellucci's residual functional capacity ("RFC") in order to

17   assess at steps four and five whether she could perform her past relevant work or any other work

18   considering her age, education, and work experience.  The ALJ found that Ms. Castellucci had the

19   following RFC:

20       [C]laimant has the residual functional capacity to perform less than sedentary work as
         defined in 20 CFR 404.1567(a).  Specifically, she can lift and/or carry 10 pounds
21       occasionally and less than 10 pounds frequently; sit for 6 hours during an 8-hour
         workday; stand and/or walk for 2 to 4 hours during an 8-hour workday; needs a
22       sit/stand alternative option of 30 minutes sitting and 30 minutes standing and/or
         walking; and requires an assistive device for balance and support.
23

24   *Id.*  In making this RFC finding, the ALJ stated that she considered Ms. Castellucci's symptoms and

25   how consistent they were with the objective medical evidence (based on the requirements of 20

26   C.F.R. § 404.1529 and Social Security Rulings 96-4p and 96-7p).  *See* AR 27.  She also considered

27   opinion evidence under 20 C.F.R. § 404.1527 and Social Security Rulings 96-2p, 96-5p, 96-6p, and

28   06-3p.  AR 22.  The ALJ stated that she must follow a two-step process, first determining "whether

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

there is an underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce" Ms. Castellucci's pain and symptoms, and then evaluating "the intensity, persistence, and limiting effects" of the symptoms to determine the extent that they limited Ms. Castellucci's ability to do basic work activities.  *Id.*  For the second part, whenever Ms. Castellucci's statements about the intensity or functionally limiting effects of pain or other symptoms were not substantiated by objective medical evidence, the ALJ stated that she must make findings on the credibility of the statements based on the entire case record.  *Id.*

The ALJ noted that Ms. Castellucci "alleged disability based on spinal stenosis; nerve root damage; degenerative disk disease; limited range of motion as a result of spinal surgery; left radiculopathy; disc desiccation at [L1-L4]; osteoporosis of the spine; degenerative spondylolisthesis; spinal deterioration; and nerve damage."  *Id.*  The ALJ also noted that Ms. Castellucci reported "that she has some problems with personal care; only occasionally prepares her own meals; does simple dusting and washing cups; cannot not carry things; cannot not turn or [t]wist when driving; and can walk 1/4 of a block before needing to rest."  *Id.*  In addition, the ALJ recounted Ms. Castellucci's testimony at the hearing.  AR 23 (summarized *supra* at AR 43-49).  The ALJ reported that Ms. Castellucci testified that she drove to the grocery store once or twice a week, but had someone come with her to help; she could stand more than 5 to 10 minutes; and she did not take public transportation due to her poor balance.  *Id.*  The ALJ further noted that Ms. Castellucci testified that she could not work because she could not walk very far or sit for more than a couple minutes, was in constant pain, had three surgeries in the last 19 months and four unsuccessful nerve root blocks, was looking at possibly more spinal fusion surgeries, does not sleep at night, and has problems with her right hand locking.  *Id.*  The ALJ noted that Ms. Castellucci stated that she lost grip and strength on her right hand, but does not receive any treatment for it.  *Id.*

The ALJ then noted that in a Third Party Questionnaire, Ms. Castellucci's mother reported that her daughter needed help with personal care, could no longer hold a job, do gardening or housework without limitations, care for animals, or do things for friends.  *Id.* (citing AR 212-19).[15]

---

[15] The ALJ did not "fully accept" this statement.  *See* AR 26.

UNITED STATES DISTRICT COURT
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

In assessing the residual functional capacity, the ALJ accorded great weight to the opinion of the consultative examiner, Dr. Osborne, because "he reviewed extensive records, he examined the claimant, and he is a specialist in orthopedics."  AR 25 (citing AR 462-75).  Furthermore, the ALJ stated that Dr. Osborne's opinion appears to be consistent with the CT scan of Ms. Castellucci's lumbar spine performed on April 5, 2012, six days prior to the examination.  *Id.*  The ALJ noted that post-hearing, Ms. Castellucci, her mother, and her attorney argued that Dr. Osborne's opinion was entitled to no weight because "his report was inaccurate, misleading, and partially fabricated," pointing out tests the doctor did not perform and alleging that he did not review her medical records prior to the examination.  *Id.*  Nevertheless, the ALJ pointed out that even if Dr. Osborne failed to review the records prior to the examination, "it is clear that he reviewed them prior to writing his medical source statement and he did physically examine the claimant."  *Id.*  The ALJ then noted that although Ms. Castellucci's mother, who is a nurse, appears to be very specific about what was not performed at the examination, she is not an acceptable medical source.  *Id.*  Hence, the ALJ stated that the mother's opinions of the diagnostic techniques are entitled to less weight than the opinion of Dr. Osborne, who is an acceptable medical source.  AR 25-26.  Additionally, the ALJ pointed out that because Ms. Castellucci's mother signed her statement only as a registered nurse and failed to mention that she was related to Ms. Castellucci, her credibility is somewhat diminished.  AR 26. Accordingly, the ALJ determined that she was "unable to fully accept" the third party statement of Ms. Castellucci's mother.  *Id.*

The ALJ accorded some weight to Dr. Van Kirk's opinion because he is a board-certified orthopedist, examined Ms. Castellucci, and reviewed the radiographic reports and treatment notes from Dr. Byers.  *Id.*  But, the ALJ said that because Dr. Van Kirk examined Ms. Castellucci approximately 3 months after her September 2010 surgery, his opinion was not "a full picture of the claimant's functional capacity 12 months post surgery and beyond."  *Id.*

Finally, the ALJ determined that she was unable to rely on the opinion of Ms. Castellucci's treating orthopedist, Dr. Byers, because he provided his medical source statement approximately 5 months after Ms. Castellucci's September 2010 surgery.  Hence, the ALJ found that Dr. Byers's

opinion also did not "provide a full picture of [Ms. Castellucci's] functional capacity 12 months post surgery and beyond." *Id.*

After considering all the evidence, the ALJ found that Ms. Castellucci's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but that her "statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment." *Id.* In support of this, the ALJ referred to Dr. Osborne's opinion noting Ms. Castellucci's exaggeration of her symptoms on history and physical examination and her poor effort on range of motion testing. *Id.* Ultimately, the ALJ opined that "neither the objective medical evidence nor the subjective allegations, to the extent that they are reasonably credible, warrant any more restrictive functional limitations than those found in this case." *Id.*

Having determined Ms. Castellucci's RFC, the ALJ proceeded with steps four and five of the sequential evaluative process.

At step four, the ALJ found that Ms. Castellucci was not capable of performing her past relevant work. *Id.* The ALJ summarized the VE's testimony regarding Ms. Castellucci's relevant work experience and stated that "[t]he vocational expert . . . classified the claimant's past relevant work as sales agent/business services (DOT 251.357-010, light, SVP 5); and customer service insurance sales agent (DOT 250.257-010, light, SVP 6). *Id.* The VE testified that "an individual with the same age, education, work experience, and residual functional capacity as the clamant would not be able to perform these positions." *Id.* Therefore, based on the VE's testimony, the ALJ concluded that Ms. Castellucci was not capable of performing her past relevant work. *Id.*

At step five, the ALJ noted that Ms. Castellucci "was 56 years old, which is defined as an individual of advanced age pursuant to 20 C.F.R. § 404.1563," had at least a high school education, could communicate in English, and had acquired work skills from past relevant work. *Id.* The ALJ stated that the VE identified skills from Ms. Castellucci's past relevant work as computer skills, sales skills, and general knowledge of insurance programs. AR 27. The ALJ then stated that the VE was asked to consider whether occupations existed in the national economy for an individual with Ms. Castellucci's age, education, past work experience, and RFC. *Id.* The ALJ accepted the VE's

1    testimony that Ms. Castellucci could work as a telephone solicitor (DOT# 3299.257-014) and that

2    his testimony was consistent with the information contained in the Dictionary of Occupational

3    Titles. *Id.* Based on the VE's testimony, the ALJ concluded that Ms. Castellucci had "acquired

4    work skills from past relevant work that are transferable to other occupations with jobs existing in

5    significant numbers in the national economy." *Id.* Specifically, the ALJ concluded that the "VE's

6    testimony indicated that the claimant's previous work is so similar to the job recited above that the

7    claimant would need to make very little, if any, vocational adjustment in terms of tools, work

8    processes, work settings, or the industry." *Id.* Accordingly, the ALJ found that although Ms.

9    Castellucci's "additional limitations do not allow [her] to perform the full range of sedentary work,

10   considering [her] age, education, and transferable work skills, a finding of 'not disabled' is

11   appropriate." *Id.*

12       The ALJ thus concluded that the Ms. Castellucci was not under a disability, as defined in the

13   Social Security Act, at any time from the alleged onset date of March 11, 2010 through the May 24,

14   2012 decision. *Id.*

15                                    **ANALYSIS**

16   **I. LEGAL STANDARD**

17       **A. Standard of Review**

18       Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the

19   Commissioner if the plaintiff initiates the suit within 60 days of the decision. District courts may set

20   aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or

21   are not supported by substantial evidence in the record as a whole." 42 U.S.C. § 405(g); *Vasquez v.*

22   *Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quotation omitted). "Substantial evidence means more

23   than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind

24   might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th

25   Cir. 1995). If the evidence in the administrative record supports both the ALJ's decision and a

26   different outcome, the court must defer to the ALJ's decision and may not substitute its own

27   decision. *See id.*; *accord Tackett v. Apfel*, 180 F.3d 1094, 1097-98 (9th Cir. 1999).

28

UNITED STATES DISTRICT COURT
For the Northern District of California

**B.  Applicable Law: Five Steps to Determine Disability**

An SSI claimant is considered disabled if (1) he suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(A), (B).

The Social Security regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act.  *See* 20 C.F.R. § 404.1520.  The five steps are as follows:

> **Step One.**  Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits.  If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation proceeds to step two.  *See* 20 C.F.R.        § 404.1520(a)(4)(i).
>
> **Step Two.**  Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled.  If so, the evaluation proceeds to step three.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).
>
> **Step Three.**  Does the impairment "meet or equal" one of a list of specified impairments described in the regulations?  If so, the claimant is disabled and is entitled to benefits.  If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four.  *See* 20 C.F.R. § 404.1520(a)(4)(iii).
>
> **Step Four.**  Considering the claimant's RFC, is the claimant able to do any work that he or she has done in the past?  If so, then the claimant is not disabled and is not entitled to benefits.  If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step.  *See* 20 C.F.R. § 404.1520(a)(4)(iv).
>
> **Step Five.**  Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?"  If not, then the claimant is disabled and entitled to benefits.  *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.  If the Commissioner meets this burden, the claimant is not disabled.

For steps one through four, the burden of proof is on the claimant.  At step five, the burden shifts to the Commissioner.  *See Tackett*, 180 F.3d at 1098.

UNITED STATES DISTRICT COURT
For the Northern District of California

## II. DISCUSSION

Ms. Castellucci challenges the ALJ's decision on two grounds: (1) the ALJ failed to adduce sufficient evidence to support the finding that she had transferable skills from her past work; and (2) the ALJ erred by disregarding her treating physician's opinion without legitimate reasons. Motion, ECF No. 19. The Commissioner counters that the ALJ properly found that Ms. Castellucci acquired skills from her past work that were transferable to other, available positions and also provided valid reasons for rejecting Dr. Byers's RFC assessment. Opp'n, ECF No. 20. The court remands to the Social Security Administration for an award of benefits.

### A. The ALJ Failed to Provide Specific and Legitimate Reasons for Rejecting Ms. Castellucci's Treating Physician

The court first addresses the question of whether the ALJ provided a sufficient basis to reject the opinion of Dr. Byers, Ms. Castellucci's treating physician. Ms. Castellucci argues that the ALJ erred by rejecting Dr Byers's testimony solely because he drafted his medical source statement in February 2011, just five months after Ms. Castellucci's September 2010 surgery. Motion at 13. The Commissioner reads the ALJ's decision more broadly, and argues that the ALJ rejected Dr. Byers's opinion because it was contradicted by Dr. Osborne's more recent opinion. Opp'n at 10-11. The court agrees with Ms. Castellucci that the ALJ failed to articulate a sufficient basis for rejecting Dr. Byers's opinion. In any case, the opinion provided by Dr. Osborne is flawed.

When determining whether a claimant is disabled, the ALJ must consider each medical opinion in the record together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *Zamora v. Astrue*, No. C 09-3273 JF, 2010 WL 3814179, at *3 (N.D. Cal. Sept. 27, 2010). "By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians." *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527). "The opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'" *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)). "However, the opinion of the treating physician is not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Id.* (citing *Magallanes v. Bowen*, 881 F.2d

747, 751 (9th Cir. 1989) and *Rodriguez v. Bowen*, 876 F.2d 759, 761-62, n.7 (9th Cir. 1989)). "If a treating physician's opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight.'" *Orn*, 495 F.3d at 631(quoting 20 C.F.R. § 404.1527(d)(2)).

"If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [Social Security] Administration considers specified factors in determining the weight it will be given." *Id.* "Those factors include the '[l]ength of the treatment relationship and the frequency of examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician." *Id.* (quoting 20 C.F.R. § 404.1527(d)(2)(i)-(ii)). "Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and '[o]ther factors' such as the degree of understanding a physician has of the [Social Security] Administration's 'disability programs and their evidentiary requirements' and the degree of his or her familiarity with other information in the case record." *Id.* (quoting 20 C.F.R. § 404.1527(d)(3)-(6)). Nonetheless, even if the treating physician's opinion is not entitled to controlling weight, it still is entitled to deference. *See id.* at 632 (citing SSR 96-02p). Indeed, "[i]n many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-02p.

The regulations distinguish among three types of physicians: (1) treating physicians; (2) examining physicians; and (3) non-examining physicians. 20 C.F.R. § 416.927(c), (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's weight carries more weight than a reviewing physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001); 20 C.F.R. § 416,927(c)(1)-(2). The opinion of a treating physician is given the greatest weight because the treating physician is employed to cure and has a greater opportunity to understand and observe a

claimant. *See Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996), *see also Magallanes*, 881 F.2d at 751 (9th Cir. 1989). Accordingly, "[i]n conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJs weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527). "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Id.* (quotation and citation omitted). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (quotation omitted). Opinions of non-examining doctors alone cannot provide substantial evidence to justify rejecting either a treating or examining physician's opinion. *See Morgan*, 169 F.3d at 602. An ALJ may rely partially on the statements of non-examining doctors to the extent that independent evidence in the record supports those statements. *Id.* Moreover, the "weight afforded a non-examining physician's testimony depends 'on the degree to which they provide supporting explanations for their opinions.'" *See Ryan*, 528 F.3d at 1201 (quoting 20 C.F.R. § 404.1527(d)(3)).

Here, the ALJ failed to provide specific and legitimate reasons supported by substantial evidence for discounting Dr. Byers's opinion as to Ms. Castellucci's physical limitations. *See Batson*, 359 F.3d at 1195. The ALJ stated the following:

> Finally, the undersigned is unable to rely on the opinion of the claimant's treating orthopedist Dr. Byers because he provided his medical source statement approximately 5 months after the claimant's September 2010 surgery. Again, this doctor's opinion does not provide a full picture of the claimant's functional capacity 12 months post surgery and beyond.

AR 26.

The problem with the ALJ's reasoning is that the mere fact a medical opinion is somewhat dated is not sufficient evidence to reject a treating physician's testimony. Faced with an analogous situation, the Ninth Circuit has explained that a more recent opinion trumps an earlier one where the facts show the claimant's condition to be progressively deteriorating. *See Stone v. Heckler*, 761 F.2d 530 (9th Cir. 1985) (reversing district court decision in favor of the agency and remanding for an award of benefits). Because the claimant's condition was progressively deteriorating, the Court held

1   that the ALJ erred in relying on older examining physicians' opinions to discredit a more recent

2   treating physician's opinion.  *Id.* at 530.  Here, the converse holds true.  If there were evidence

3   showing that Ms. Castellucci condition were improving, the ALJ might not have erred in rejecting

4   Dr. Byers's opinion solely because of its date.  But the ALJ failed to cite any evidence that Ms.

5   Castellucci's symptoms were improving or provide any reason why Dr. Byers's opinion was no

6   longer valid.  In fact, Dr. Byers's post-February 2011 findings reveal that in or around February

7   2012, Ms. Castellucci "continue[d] to experience significant residual low back symptoms and

8   radicular symptoms involving her left lower extremity" without experiencing any benefits from

9   further nerve root block injections.  AR 400.

10   Moreover, in order to give less than controlling weight to the opinion of a treating physician, an

11   ALJ must address the factors discussed in *Orn v. Astrue*, 495 F.3d at 631 (listing "the length of the

12   treatment relationship, the frequency of examination by the treating physician; and the nature and

13   extent of the treatment relationship between the patient and the treating physician" as factors).  The

14   ALJ failed to address these factors.  Accordingly, the court finds that the ALJ erred in rejecting Dr.

15   Byers's RFC opinion solely because of its date.

16   In response, the Commissioner argues that the ALJ "essentially rejected Dr. Byers'[s] opinion

17   because it was contradicted by objective medical findings of a consultative physician, because the

18   findings of the CE were made with knowledge of Dr. Byers'[s] medical records, because Dr.

19   Byers'[s] statements were in 2010[16] while Dr. Osborne had the advantage of reviewing the entire

20   medical record including Dr. Byers'[s] records through 2012, and because Dr. Byers'[s] statements

21   were made only 5 months after Plaintiff's surgery."  Opp'n at 9-10.  There are several problems with

22   the Commissioner's reasoning.

23   First, the ALJ stated just one reason for rejecting Dr. Byers's opinion and that was its date.  This

24   court cannot make its own findings but is "constrained to review the reasons the ALJ asserts."  *See*

25   *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003) (holding that "[i]t was error for the district

26   court to affirm the ALJ's credibility decision based on evidence that the ALJ did not discuss").

27   _____

28        [16]  Not so.  Dr. Byers's statement was dated February 25, 2011.  AR 378.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Had the ALJ provided a reason for crediting Dr. Osborne's opinion over Dr. Byers's, it would

2    not change the outcome because Dr. Osborne's opinion is contradictory and unreliable.  For

3    example, Dr. Osborne opined that Ms. Castellucci could "lift and/or carry . . . 10 pounds

4    occasionally and 10 pounds frequently" and could only stand and/or walk a maximum of 2 hours in

5    a workday.  AR 468.  Nonetheless, he also opined that she could frequently "climb[] ramps, stairs,

6    ladders, ropes and scaffolds."  AR 469.  He opined that Ms. Castellucci required a "hand-held

7    assistive device (i.e. a a [sic] cane) . . . for balance and support . . . for 8 hours in an 8 hour day."

8    AR 468.  But he also opined that "[b]alancing can be done frequently."  AR 469.  His clinical

9    findings showed that Ms. Castellucci's diminished range of motion prevented her from holding her

10   arms straight up.  See AR 466.  But he opined that "[t]he claimant can reach without limitations in

11   all directions, including overhead."  AR 469.  There is a fundamental disconnect between Dr.

12   Osborne's clinical findings and his erroneous opinions as to Ms. Castellucci's capabilities, and these

13   inconsistencies render his report wholly unreliable.

14       Finally, the ALJ lacked substantial evidence to support crediting Dr. Osborne's opinion over Dr.

15   Byers's.  The ALJ accorded "great weight" to Dr. Osborne's opinion "because he reviewed

16   extensive records, he examined the claimant, and he is a specialist in orthopedics.  Further, his

17   opinion appears to be consistent with the radiographic evidence . . . which was performed 6 days

18   prior to the examination."  AR 25.  But these justifications do not constitute "substantial evidence."

19       Where a "treating physician's opinion is contradicted by another doctor, the ALJ may not reject

20   the opinion without providing 'specific and legitimate reasons' supported by substantial evidence in

21   the record."  Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998) (quoting Lester v. Chater, 81 F.3d

22   821, 830 (9th Cir. 1995)).  "When an examining physician relies on the same clinical findings as a

23   treating physician, but differs only in his or her conclusions, the conclusions of the examining

24   physician are not 'substantial evidence.'"  Orn, 495 F.3d at 632.  "By contrast, when an examining

25   physician provides 'independent clinical findings that differ from the findings of the treating

26   physician,' such findings are 'substantial evidence.'"  Id. (quoting Miller v. Heckler, 770 F.2d 845,

27   849 (9th Cir. 1985)).

28

UNITED STATES DISTRICT COURT
For the Northern District of California

As in *Orn*, "the *findings* of the non-treating physician were the same as those of the treating physician. It was his *conclusions* that differed . . . ." *Id.* The most recent medical record that Dr. Osborne considered was the February 27, 2012 MRI of Ms. Castellucci's lumbosacral spine. *See* AR 463. Dr. Osborne noted that the MRI showed evidence of degenerative disc disease, and at least two surgeries. *Id.* One of these surgeries was an "interbody fusion," though the MRI failed to show that the fusion was "solid." *Id.* The earliest record was a November 15, 2010 CT scan, which Dr. Osborne "interpreted as findings similar to the previously cited MRI scan." *Id.* Because the November 15, 2010 CT scan predated Dr. Byers's medical source statement and (according to Dr. Osborne) it was consistent with the more recent medical evidence, the medical records did not provide Dr. Osborne with new findings that contradicted Dr. Byers's.

Nor does the ALJ cite any evidence from Dr. Osborne's physical examination of Ms. Castellucci that could constitute "independent clinical findings" that differed from Dr. Byers's. Dr. Osborne does not note different findings and even if he had, he still fails to tether his opinions about Ms. Castellucci's limitations to the clinical findings he made. *See* AR 468-69.

The closest thing in the record to an independent clinical finding is the ALJ's statement that Dr. Osborne's opinion is reliable because it "appears to be consistent" with later radiographic evidence. *See* AR 25. But the ALJ does not assert that the referenced radiographic evidence contradicts Dr. Byers's findings, and it is not clear that the ALJ possesses the expertise to reach that conclusion on her own. In sum, the ALJ lacked specific and legitimate reasons for rejecting Dr. Byers's opinion.[17]

---

[17] The court does not reach the question of whether the ALJ erred by disregarding Ms. Castellucci and her mother's statements that Dr. Osborne did not perform all of the diagnostic tests listed in his report. Nor does the court consider whether the ALJ erred in discrediting Ms. Castellucci's mother's statement because she "signed her statement as a registered nurse, and did not mention that she was related to the claimant." AR 26.

**B.  The ALJ Failed to Adduce Sufficient Evidence to Support the Finding of Transferable Work Skills**

The second issue is whether the ALJ erred in determining that Ms. Castellucci had skills that were transferable to work as a telephone solicitor and that she "would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry" AR 27.

The ALJ must find a claimant disabled if the claimant is (1) severely impaired; (2) of advanced age; (3) cannot do medium work; and (4) does not possess skills that can be transferred to less demanding jobs which exist in significant numbers in the national economy.  20 C.F.R. § 404.1563(d).  If the ALJ finds that the claimant possesses transferrable skills, she "is required to make certain findings of fact and include them in the written decision.  Findings should be supported with appropriate documentation."  *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1223 (9th Cir. 2009).  The Social Security Regulations provide that a claimant's skills will be considered transferable "when the skilled or semi-skilled work activities [the claimant] did in the past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs."  *Renner v. Heckler*, 786 F.2d 1421, 1423 (9th Cir. 1986).  Complete similarity of skills, however, is not necessary.  *Id.* at 1423.

There is a heightened standard in cases where a claimant is "of advanced age" (55 or over).[18]  An advanced age claimant's skills will only be transferable to a new job if there is "very little, if any, vocational adjustment required in terms of tools, work processes, work settings, or the industry."  *Id.*; *see also* 20 C.F.R. § 404.1568(d)(4), *Bray*, 554 F.3d at 1224.  The ALJ's findings as to vocational adjustment must be supported by substantial evidence.  *See Renner*, 786 F.2d at 1424 (reversing and remanding where the record was silent as to the amount of vocational adjustment required for the claimant to transfer into the new positions).

For example, in *Birkenstein v. Colvin*, No. SA-CV-12-1525-SP, 2013 WL 3872098, at *11 (C.D. Cal. July 25, 2013), the district court reversed the Commissioner's decision because the ALJ relied

---

[18]  Agency regulations consider this age "the point where age significantly affects a person's ability to do substantial gainful activity."  *Terry v. Sullivan*, 903 F.2d 1273 (9th Cir. 1990).

on a VE's vague testimony regarding transferable skills to conclude that very little to no vocational

adjustment would be required for the claimant to transfer from her past work as an emergency nurse

to work as a school nurse or office nurse.

> The ALJ stated that at the hearing the VE "was asked if any occupations exist which could be performed by an individual with the same age, education, past relevant work experience, and residual functional capacity as the claimant, and which require skills acquired in the claimant's past relevant work but no additional skills." The ALJ then stated that the VE identified school nurse and office nurse as occupations that such individuals could perform. This description of the VE's testimony appears to show that no vocational adjustment would be necessary for plaintiff in taking up work as a school nurse or an office nurse.

*Birkenstein*, 2013 WL 3872098, at *11 (internal citations omitted). The problem with that

description was that the ALJ inaccurately recounted the VE's testimony. *Id.* The ALJ did not really

ask about "additional skills," just "whether there were transferable skills from plaintiff's past

relevant work to which the VE responded: 'I believe there would be transferable skills.'" *Id.*

Although "the VE did state that '[t]he work of an ER nurse . . . would be significantly more

complicated than . . . a school nurse and office nurse,' at no point did the VE indicate that 'no

additional skills' would be necessary for the alternative jobs." *Id.*

Here, the ALJ misstated the VE's testimony in the same way. In her decision, the ALJ stated the

following:

> The vocational expert was asked if any occupations exist which could be performed by an individual with the same age, education, past relevant work experience, and residual functional capacity as the claimant, and which require skills acquired in the claimant's past relevant work *but no additional skills*.

AR 27 (emphasis added). In contrast, the hearing transcript shows that the ALJ asked the VE to

summarize Ms. Castellucci's past work. AR 50-51. She then asked, "[a]nd are there any

transferable skills that would have been gained through training or education?" AR 51. The VE

responded that "there would be computer skills . . . sales skills[, g]eneral knowledge of insurance

programs, accounting procedures, et cetera, but not detailed knowledge. So I'd say mostly computer

and sales skills, Judge." *Id.* The ALJ then described a hypothetical person with most (but not all) of

the limitations in the ALJ's RFC determination, and asked whether such a person could do other

jobs. *See* AR 51-52. The ALJ never asked about additional skills or the degree of vocational

adjustment necessary for Ms. Castellucci to work as a telephone solicitor. Nonetheless, the ALJ

UNITED STATES DISTRICT COURT
For the Northern District of California

concluded that "[t]he [VE's] testimony indicated that the claimant's previous work is so similar to the job recited above that the claimant would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry.  AR 27.  Thus, the VE's testimony cannot be interpreted as having made a specific showing that Ms. Castellucci would have to make very little to no vocational adjustment to work as a telephone solicitor.  Thus, the ALJ's finding that Ms. Castellucci had to make little, if any, vocational adjustment is unsupported by the record.

The Commissioner's arguments to the contrary are unpersuasive.  First, the Commissioner argues that exact similarity between jobs is not required for a finding of transferability.  Opp'n, ECF No. 20 at 6 (citing *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847 (6th Cir. 2010); *Thompson v. Comm'r of Soc. Sec.*, No. 1:07cv161, 2008 WL 850167, at *4 (S.D. Ohio Mar 28, 2008); *Faison v. Sec'y of Health & Human Servs.*, 679 F.2d 598, 600 (6th Cir. 1982)).  Those cases, however, are inapposite because the issue is the sufficiency of the ALJ's findings about the amount of vocational adjustment needed for Ms. Castellucci to "perform the identified job at a high degree of proficiency with a minimal amount of job orientation."  SSR 82-41, 1982 WL 31389; *see also Renner*, 786 F.2d at 1424.

The Commissioner also argues that no unique tools, raw materials, products, processes, or services distinguish the work Ms. Castellucci performed in the past from that of a telephone solicitor.  Opp'n at 7.  This argument is unsupported by the record.  The VE's one-sentence testimony regarding the work of a telephone solicitor fails to mention or compare any tools, raw materials, products, process, or services involved.  *See* AR 52.  Ultimately, the ALJ's lack of inquiry as to the issue of vocational adjustment renders her decision unsupported by substantial evidence.

Finally, the Commissioner argues that the ALJ's failure to inquire specifically about vocational adjustment constitutes harmless error.  Opp'n at 8.  In social security cases, "an ALJ's error is harmless where it is inconsequential to the ultimate nondisability determination."  *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012) (internal citations omitted).  In other words, the Ninth Circuit "look[s] at the record as a whole to determine whether the error alters the outcome of the case."  *Id.*

The Commissioner's harmless error argument is unpersuasive because the ALJ's failure to inquire about vocational adjustments is material to the disability (or nondisability) determination.

Absent any other method of showing the requisite degree of vocational adjustment, the VE's testimony is always material in cases involving advanced-age claimants.  *See Coletta v. Massanari*, 163 F. Supp. 2d 1101, 1105-06 (N.D. Cal. 2001) (finding the ALJ erred when the VE neglected to address whether the claimant could vocationally adjust to the new position in terms of tools, work processes, work settings, or the industry).  Furthermore, at step five of the Social Security Regulations, the Commissioner has the burden of proof to show that the claimant in not disabled. *See Tackett*, 180 F.3d at 1098.  Hence, in order for the Commissioner to meet her burden, she needed the VE's testimony regarding vocational adjustment to show that Ms. Castellucci is not disabled.  Accordingly, if the VE were to testify that Ms. Castellucci would need to make more than a minor adjustment to proficiently perform the work of a telephone solicitor, then Ms. Castellucci would be found disabled and entitled to benefits.  In looking at the record as a whole, the court finds that the ALJ's error was material to the ultimate nondisability determination, and accordingly, cannot consider the error harmless.

**C.  The ALJ's Decision is Erroneous for Additional Reasons.**

The parties' summary judgment motions address the issues discussed above.  The court notes that there are other grounds that support the conclusion that the decision below was erroneous.  For example, the ALJ's RFC determination was flawed.  The ALJ determined that Ms. Castellucci could "sit for 6 hours during an 8-hour workday; stand and/or walk for 2 to 4 hours during an 8-hour workday; needs a sit/stand alternative option of 30 minutes sitting and 30 minutes standing and/or walking; and requires an assistive device for balance and support."  AR 22.  This assessment is not fully supported by the medical evidence.

The medical evidence does not support the ALJ's conclusion that Ms. Castellucci could stand and/or walk for "2 to 4" hours.  *See* AR 22.  Dr. Osborne opined that Ms. Castellucci could stand and/or walk "for up to 2 hours in a normal 8-hour workday," AR 468, Drs. Rubaum and Amon said "at least 2 hours," AR 384, and Dr. Byers said "less than 2 hours," AR 377.  Only the first consulting examiner, Dr. Van Kirk, who examined Ms. Castellucci in December 2010, opined that she should be "able to stand and/or walk cumulatively for four hours out of an eight-hour day."  AR 353.  But the ALJ cannot reject Dr. Byers's February 2011 RFC assessment as out of date but accept

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1  Dr. Van Kirk's even earlier assessment.  At most, the medical evidence supports a finding that Ms.

2  Castellucci could stand and/or walk for at least two hours.

3      That finding, however, renders the ALJ's RFC determination unworkable.  The ALJ determined

4  that Ms. Castellucci needs to be able to sit for 30 minutes and then stand and/or walk for 30 minutes.

5  *See* AR 22.  But if she can only stand and/or walk for two hours total, there is no way for her to

6  work an eight-hour day.

7      Another problem with the decision is that the ALJ's hypothetical to the VE did not take into

8  account all of Ms. Castellucci's limitations.  First, the ALJ's hypothetical involved an individual of

9  Ms. Castellucci's age, education, and work history who could perform sedentary work.  AR 51.  The

10  VE identified telephone solicitor as a sedentary job.  AR 52.  But the ALJ ultimately determined that

11  Ms. Castellucci could perform "less than sedentary work."  AR 22.  The record does not support a

12  finding that there are "less than sedentary" jobs that Ms. Castellucci could perform.

13      Second, although the ALJ determined that Ms. Castellucci "requires an assistive device for

14  balance and support," AR 22, the hypothetical did not address this, *see* AR 49-55.  This is

15  problematic, in part, because Ms. Castellucci has to stand for a significant portion of the work day.

16  It is unclear how she could stand, use a cane, and still perform in a job that involves "a lot of data

17  entry."  AR 52.

18  **III.   REMAND FOR PAYMENT OF BENEFITS**

19      Given the court's conclusions that the ALJ improperly discredited Dr. Byers's opinion,

20  erroneously considered Dr. Osborne's opinion, and erred by failing to consider the issue of

21  vocational adjustment, the court must decide whether to remand this case to the Social Security

22  Administration for further proceedings or for the payment of benefits.

23      The Ninth Circuit has provided guidance on this question:

24      Remand for further administrative proceedings is appropriate if enhancement of the record
    would be useful. *See Harman,* 211 F.3d at 1178. Conversely, where the record has been

25      developed fully and further administrative proceedings would serve no useful purpose, the
    district court should remand for an immediate award of benefits.  *See Smolen v. Chater,* 80

26      F.3d 1273, 1292 (9th Cir. 1996); *Varney v. Secretary of Health and Human Services,* 859
    F.2d 1396, 1399 (9th Cir. 1988).  More specifically, the district court should credit evidence

27      that was rejected during the administrative process and remand for an immediate award of
    benefits if (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence;

28      (2) there are no outstanding issues that must be resolved before a determination of disability

1  can be made; and (3) it is clear from the record that the ALJ would be required to find the
2  claimant disabled were such evidence credited. *Harman,* 211 F.3d at 1178; *see also McCartey v. Massanari,* 298 F.3d 1072, 1076–77 (9th Cir. 2002); *Smolen,* 80 F.3d at 1292.

3  Where the *Harman* test is met, we will not remand solely to allow the ALJ to make specific
   findings regarding excessive pain testimony. Rather, we take the relevant testimony to be
4  established as true and remand for an award of benefits. *Varney,* 859 F.2d at 1401; *see also Reddick v. Chater,* 157 F.3d 715, 728 (9th Cir. 1998) (quoting *Varney* ); *Lester,* 81 F.3d at
5  834 (same); *Swenson v. Sullivan,* 876 F.2d 683, 689 (9th Cir. 1989) (same); *but cf. Connett v. Barnhart,* 340 F.3d 871, 876 (9th Cir. 2003) (holding that the court has flexibility in crediting
6  petitioner's testimony if substantial questions remain as to her credibility and other issues
   must be resolved before a determination of disability can be made).

7

8  *Benecke v. Barnhart,* 379 F.3d 587, 594-95 (9th Cir. 2004).

9     Because the court concludes that the ALJ did not provide legally sufficient reasons for

10  discrediting Dr. Byers's opinions, it is treated as true. *Benecke,* 379 F.3d at 594. Besides Dr.

11  Osborne, no examining physician's testimony contradicts Dr. Byers's determination.

12     Dr. Byers's opinion, credited as true, mandates an award of benefits. Dr. Byers opined that Ms.

13  Castellucci would need to take unscheduled breaks in an 8-hour working day every 30 minutes of

14  "more less 15 min" in duration. AR 377. At the administrative hearing, Ms. Castellucci's attorney

15  asked the VE whether there would be jobs in the economy if the hypothetical person described by

16  the ALJ also "had to take breaks at unscheduled times [f]or as long as 15 minutes outside of the

17  normal breaks allotted for that type of job." AR 53. The VE responded "that would not be tolerated

18  in a phone bank situation. Some telephone solicitors work from home and make calls, but those are

19  very much the minority and there would not be a significant number of jobs" after the other

20  limitations are taken into account. AR 53-54. Thus, using Dr. Byers's now-credited limitations, the

21  VE already testified that Ms. Castellucci cannot perform her past relevant work or any other jobs in

22  the national economy. The court finds that remand for the payment of disability benefits is

23  appropriate.

24

25

26

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

1

**CONCLUSION**

2       The court **GRANTS** Ms. Castellucci's motion for summary judgment, **DENIES** the

3   Commissioner's cross-motion for summary judgment, and **REMANDS** this case to the Social

4   Security Administration for an award of benefits.

5       This disposes of ECF No. 19.

6       **IT IS SO ORDERED.**

7   Dated: September 4, 2014



8                                                         _____
                                                         LAUREL BEELER
                                                         United States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California